1   DENNIS J. HERRERA, State Bar #139669
    City Attorney
2   OWEN J. CLEMENTS, State Bar #141805
    Chief of Special Litigation
3   PETER J. KEITH, State Bar #206482
    CHRISTINE VAN AKEN, State Bar #241755
4   ANN M. O'LEARY, State Bar #238408
    Deputy City Attorneys
5   Office of the City Attorney
    1 Dr. Carlton B. Goodlett Place, Suite 234
6   San Francisco, CA 94102
    Telephone:    (415) 554-4721
7   Facsimile:    (415) 554-4757
    E-Mail:        christine.van.aken@sfgov.org
8
    Attorneys for Plaintiff
9   THE PEOPLE OF THE STATE OF CALIFORNIA
    Ex rel. San Francisco City Attorney Dennis J. Herrera
10
                  UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through City Attorney Dennis J. Herrera, | Case No. C 07-2789-JSW |
| Plaintiffs, | **DECLARATION OF CHRISTINE VAN AKEN IN SUPPORT OF PLAINTIFF PEOPLE OF THE STATE OF CALIFORNIA'S (1) REPLY IN SUPPORT OF MOTION TO REMAND AND (2) REPLY IN SUPPORT OF FEE AWARD MOTION** |
| vs. | |
| CHECK 'N GO OF CALIFORNIA, INC. d/b/a CHECK 'N GO; SOUTHWESTERN & PACIFIC SPECIALTY FINANCE, INC. d/b/a CHECK 'N GO; AVANTE TELADVANCE, INC. d/b/a CHECK 'N GO ONLINE; MONETARY MANAGEMENT OF CALIFORNIA, INC. d/b/a MONEY MART; MONEY MART EXPRESS, INC. d/b/a CUSTOMCASH ONLINE; FIRST BANK OF DELAWARE; and DOES 1-50, inclusive. | Hearing Date:        August 10, 2007<br>Hearing Judge:      Hon. J. S. White<br>Time:                     9:00 a.m.<br>Place:                    Courtroom 2, 450 Golden Gate Avenue, San Francisco, CA<br><br>Date Action Filed:      April 26, 2007<br>Date Action Removed: May 30, 2007 |
| Defendants. | |

///

///

1

**DECLARATION OF CHRISTINE VAN AKEN**

I, Christine Van Aken, declare:

1.     I am a Deputy City Attorney in the Office of City Attorney Dennis Herrera.  I am one of the counsel of record for the Plaintiff People of the State of California.  I am over the age of eighteen and I have personal knowledge of the matters stated in this declaration, unless otherwise stated.

2.     I have reviewed the City Attorney's Office's billing records in connection with this action.  The People's attorneys' time and fees for responding to Defendants' Opposition exceeded the time and fees estimated in the People's moving papers.  However, the People will not request compensation for the additional fees incurred above its estimate.

3.     Attached as Exhibit A to this declaration is a true and correct copy of a document that I obtained from a publication by the National Consumer Law Center entitled The Cost of Credit.  I am informed and believe that this document is a true and correct copy of a letter from Donald E. Powell, Chairman of the Federal Deposit Insurance Corporation, to Roy Cooper, Attorney General of the State of North Carolina, dated April 27, 2005.  The San Francisco City Attorney's Office has made a request to North Carolina officials to supply true and correct copies of this and other documents contained in their files.

4.     Attached as Exhibit B to this declaration is a true and correct copy of an Order in *McQuillan v. Check 'N Go of North Carolina, Inc.*, No. 7:04-CV-169-FL(1) (E.D.N.C. Feb. 2, 2005), obtained from PACER court records.

I declare under penalty of perjury under the laws of the State of California and the United States that the preceding declaration is true, and that this declaration was executed on July 27, 2007, in San Francisco, California.

_____<br>
Christine Van Aken<br>
CHRISTINE VAN AKEN

Van Aken Decl. ISO People's Remand Reply & Fee Motion Reply, Case No. C 07-2789-JSW

1

**INDEX TO EXHIBITS**

2

**Exhibit**   **Description**

3

A       Letter from Donald E. Powell, Chairman of the Federal Deposit Insurance
4                Corporation, to Roy Cooper, Attorney General of the State of North Carolina,
                 dated April 27, 2005
5

6       B       Order, *McQuillan v. Check 'N Go of North Carolina, Inc.*, No. 7:04-CV-169-
                 FL(1) (E.D.N.C. Feb. 2, 2005),
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Van Aken Decl. ISO People's Remand Reply & Fee Motion Reply, Case No. C 07-2789-JSW

# EXHIBIT A

 FEDERAL DEPOSIT INSURANCE CORPORATION, Washington DC 20429

DONALD E. POWELL
CHAIRMAN

April 27, 2005

Mr. Roy Cooper
Attorney General
State of North Carolina
Raleigh, North Carolina 27699

Dear Mr. Attorney General:

Thank you for your letter of regarding payday lending. We value your support of the Federal Deposit Insurance Corporation's recent actions to address repeated lending to frequent borrowers.

As you note, federal law authorizes federal and state-chartered insured depository institutions making loans to borrowers in other states to "export" interest rates allowed by the state where the insured depository institution is located This authorization does not prevent states from enforcing consumer protection and lending laws other than interest-rate related limitations. Though payday lending is a high-risk activity that presents safety and soundness as well as consumer protection concerns, Congress has never prohibited payday lending.

While exportation of interest rates is permissible, institutions face increased risks when they enter into certain arrangements with third-party payday lenders, including arrangements to originate loans on terms that could not be offered directly by the payday lender. The Federal Deposit Insurance Corporation Guidelines for Payday Lending address appropriate actions for managing risks associated with third parties who offer payday loans. The Guidelines make clear that the use of third parties in no way diminishes the responsibility of a bank's board of directors and management to ensure its payday lending program is conducted in a safe and sound manner and in compliance with applicable laws. FDIC-supervised banks have been informed that they will be held accountable for the activities of their payday lender partners, and the FDIC has taken actions against banks based on the activities of their payday lender partners. Banks cannot simply "rent their charter" and leave management of the program to a third party. Such an approach would prompt the FDIC to pursue appropriate corrective action, which may include instructing the bank to discontinue payday lending.

We appreciate your interest in this important issue. If you have further questions, Michael J. Zamorski, Director of our Division of Supervision and Consumer Protection, can be reached at (202) 898-8946.

Sincerely,

Donald E. Powell

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:04-CV-169-FL(1)

**FILED**

2/2/05

MICHAEL D. BROOKS. Acting Clerk
DAVID W. DANIEL, CLERK
DISTRICT COURT, EDNC

| | |
|---|---|
| ADRIANA MCQUILLAN and WALTER JAMES FAUST, on behalf of themselves and all other persons similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>CHECK 'N GO OF NORTH CAROLINA, INC.; CNG FINANCIAL CORPORATION; JARED A. DAVIS and A. DAVID DAVIS, )<br><br>Defendants. | ORDER |

This matter is before the court on plaintiffs' motion to remand, filed September 14, 2004.

(DE #9). Defendants have responded, and plaintiffs have replied. In this posture, this matter is ripe

for ruling. For the following reasons, the court grants plaintiffs' motion to remand.

STATEMENT OF THE CASE

Defendants removed this case from the Superior Court of New Hanover County, on

August 27, 2004, asserting subject matter jurisdiction on the basis of diversity of citizenship,

pursuant to 28 U.S.C. § 1332. Plaintiffs state court complaint alleges, *inter alia*, violations of North

Carolina statutes governing consumer finance, check cashing, unfair trade practices, usury, and loan

brokers, and seeks declaratory and injunctive relief, as well as refunds, damages, interest, fees and

costs.

At the same time that defendants filed their notice of removal, they also filed a motion to

compel arbitration, to stay proceedings and to stay discovery. In addition, defendants CNG Financial

Corporation, Jared A. Davis and A. David Davis, filed a motion to dismiss for lack of personal jurisdiction.

On September 14, 2004, plaintiffs filed a motion to remand, accompanied by declarations and exhibits, asserting lack of diversity on the part of defendant Check 'N Go of North Carolina, Inc., (hereinafter "Check 'n Go-NC"). Specifically, plaintiffs argue that Check 'n Go-NC's principal place of business is North Carolina, even though it is incorporated in Ohio. Moreover, plaintiffs argue that the amount in controversy is less than $75,000. Defendants timely responded, including affidavits on the diversity jurisdiction issue, and plaintiffs replied with further declarations.

On September 22, 2004, the court issued an order deferring plaintiffs' response time on defendants' motions to compel arbitration, stay proceedings, and to stay discovery, as well as the motion to dismiss for lack of personal jurisdiction, pending the resolution of plaintiffs' motion to remand.

### STATEMENT OF FACTS BEARING ON JURISDICTION

The material facts bearing on jurisdiction may be summarized as follows. Plaintiffs are individual residents of North Carolina, and the class of plaintiffs is substantially in excess of 1,000 persons. Defendant CNG Financial Corporation, (hereinafter "CNG Financial"), directed by Ohio residents Jared A. Davis and A. David Davis, is an Ohio corporation that conducts business operations in Ohio. Defendant Check 'n Go-NC is an Ohio corporation created by, and wholly owned by, CNG Financial.

Check 'n Go-NC operates retail payday lending establishments, or stores, throughout North Carolina, using the name "Check 'n Go." Check 'n Go-NC does not operate retail payday lending

stores in any other state. Since 2001, individual consumers, such as plaintiffs in this case, have gone to Check 'n Go-NC stores in North Carolina to obtain payday lending.

Under this form of lending, an individual writes a personal check for a stated amount of $500.00 or less, and obtains a promise that the check will not be presented until a date typically two weeks in the future. The customer is given funds in the amount of the check, less a finance charge. At the end of the two-week period, when the loan becomes due, the customer can let the check clear the bank, pay to get the check back or pay an additional amount to extend the loan for a short period of time.

Check 'n Go-NC, itself, does not fund payday loans. Rather, Check 'n Go-NC acts as a "loan servicing company" that markets, services, and collects loans made by County Bank of Rehoboth Beach, Delaware ("County Bank") to consumers in North Carolina. (Aff. of David E. Gillan, ¶7). Pursuant to this arrangement, County Bank, determines all of the conditions, terms, services and features offered to Check 'n Go-NC customers, and it determines finance charges, credit limits, credit standards, collection procedures and asset quality of the loans.

When a customer enters a Check 'n Go-NC store to obtain a payday loan, a Check 'n Go-NC store employee provides the customer with a County Bank credit application. The customer fills out the application, and returns it to the Check 'n Go-NC store employee, who processes the paperwork. The information from the credit application is electronically transmitted by the Check 'n Go-NC store employee to an office location in Mason, Ohio, from which it is transmitted on to County Bank's computerized loan management system in Delaware.

Upon receipt of the applicant's credit application, County Bank, through its computerized system, makes the decision to approve or reject the application. County Bank communicates its

3

credit decision electronically, initiating the decision from Delaware and routing the decision first to

Mason, Ohio, and then to the Check 'n Go-NC store at which the customer applied for the loan.

After the Check 'n Go-NC store computer system receives County Bank's credit decision,

a printer located at the store prints out the appropriate loan documents, generated by County Bank's

loan management software. If the application is approved, the computer system prepares and prints

a completed loan note and disclosure statement evidencing the terms of the loan (the "loan

agreement"). (Supp. Aff. of Robert E. Kassner, ¶12). A Check 'n Go-NC employee then collects

the loan agreement papers and gives them to the customer inside the Check 'n Go-NC store for

review and signature. The customer then signs the loan agreement and makes out a personal check

payable to County Bank. In return, the Check 'n Go-NC employee gives the customer a County

Bank loan check.[1]

---

[1]   Additional details concerning the process by which a customer obtains a loan, viewed from the perspective of the plaintiffs in this case, are described, for instance, in the Declaration of Walter James Faust:

"When I entered the Check 'n Go store, the following generally occurred:
a. I would say I wanted a loan.
b. The CNG-NC [Check 'n Go-NC] employee would ask how much of a loan I wanted.
c. I would write a personal check and hand the employee my social security card and/or driver's license for i.d., and a bank statement to show them that I had an active banking account.
d. The CNG-NC employee asked for references. The employee asked for phone numbers of the references, and asked for my home number.
e. As I wrote out a personal check, the CNG-NC employee would assist me.
f. I gave the personal check to the CNG-NC employee, over the counter.
g. The CNG-NC employee gave me a contract to sign.
h. The CNG-NC employee told me I was approved for the loan, at the store in North Carolina.
i. The CNG-NC employee gave me the funds for the loan, at the store in North Carolina.
j. I repaid the loan, at the store in North Carolina."

(Declaration of Walter James Faust, ¶6).

Each loan agreement issued by County Bank that is used at a Check 'n Go-NC store states "We are the lender, County Bank of Rehoboth Beach, Delaware." Each loan agreement also states "We have retained Check 'n Go of North Carolina, Inc. d/b/a Check 'n Go (the 'Company') to service your loan. You authorize us and the Company to share information in connection with the application, processing, funding, servicing, repayment and collection of your loan." (Supp. Aff. of Robert E. Kassner, Ex. A). Finally, the loan agreement sets out terms of an "agreement to arbitrate all disputes," stating that all claims, disputes or controversies between you and us and/or the Company (or the employees, officers, directors, agents or assigns of the other or the Company) and any claim arising from or relating to your application for this loan . . ." shall be resolved by binding arbitration. (Id.). Check 'n Go-NC does not have the right to modify any of the terms in the loan agreement.

With each loan issued by County Bank and executed by a customer within a Check 'n Go-NC store, Check 'n Go-NC has the opportunity to purchase from County Bank a participation interest. Check 'n Go-NC prepares statements and pays these funds from an Ohio bank account and transmits them to County Bank in Delaware. Check 'n Go-NC's sole source of revenue is the revenue generated by the participation interest derived from loans provided to North Carolina customers, which revenue totals in excess of $12,900,000.00 annually. Check 'n Go-NC utilizes an Ohio bank for its deposits and for checks issued to its employees.

Upon maturity of the loan, Check 'n Go-NC accepts payments and collections on the loans on behalf of County Bank at Check 'n Go-NC store locations. All loan payments and collections received by Check 'n Go-NC on behalf of County Bank are deposited on a daily basis into an account in North Carolina maintained by County Bank.

Most administrative services for Check 'n Go-NC are provided by the 409 Group, Inc., which is an Ohio corporation with its principal place of business in Ohio. All actions by the board of directors of Check 'n Go-NC take place in Ohio. All Check 'n Go-NC shareholders, officers and directors are located there as well. Check 'n Go-NC officers and employees in Ohio manage the operations between Check 'n Go-NC and County Bank, whereas lower-level employees in North Carolina come into contact with customers at Check 'n Go-NC stores.

Check 'n Go-NC has a collection agency license issued by the North Carolina Department of Insurance to allow it "to transact business of a collection agency . . . [and] to carry on the business of a collection agency in accordance with the General Statutes of North Carolina." The collection agency license lists the address of Check 'n Go-NC as "T/A: Check 'n Go, 5155 Financial Way, Mason, OH 45040." (Supp. Aff. of Robert E. Kassner, Ex. B).

## DISCUSSION

Where diversity jurisdiction is challenged in a motion to remand, as in this case, the burden of demonstrating jurisdiction by a preponderance of the evidence remains with the party seeking removal. Roche v. Lincoln Prop. Co., 373 F.3d 610, 616 (4th Cir. 2004). It is "well-settled that courts strictly construe the removal statute and resolve all doubts in favor of remanding the case to state court." Id. at 615. (citing Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09 (1941) and Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 816 (4th Cir. 2004) (en banc)).

Pursuant to 28 U.S.C. § 1332, Federal courts have jurisdiction over civil actions in which the amount in controversy exceeds $75,000.00 and the action is between "citizens of different States." 28 U.S.C. § 1332(a)(1). For purposes of determining diversity of citizenship, a corporation is considered to be a citizen of (1) the state of its incorporation and (2) the state "where it has its

6

principal place of business." 28 U.S.C. § 1332(c)(1). In this case, federal jurisdiction turns initially on whether defendant Check 'n Go-NC has its principal place of business in North Carolina or another state, such as Ohio or Delaware. If the court finds that Check 'n Go-NC has its principal place of business in North Carolina, the parties are not completely diverse and this matter must be remanded to state court.

The Fourth Circuit has "approved two tests for ascertaining a corporation's principal place of business for jurisdictional purposes, but have endorsed neither to the exclusion of the other." Peterson v. Cooley, 142 F.3d 181, 184 (4th Cir. 1998) (citing Mullins v. Beatrice Pocahontas Co., 489 F.2d 260, 262 (4th Cir. 1974)). The first test, "commonly referred to as the nerve center test, 'makes the home office, or place where the corporation's officers direct, control, and coordinate its activities, determinative.'" Id. (quoting Mullins, 489 F.2d at 262). The second test, "normally termed the place of operations test, instead 'looks to the place where the bulk of corporate activity takes place.'" Id. (quoting Mullins, 489 F.2d at 262).

Application of the nerve center test is "more appropriate" in cases such as Peterson, where the corporation is "essentially a passive investment vehicle" or "engaged primarily in the ownership and management such as debt or equities [and] is not really geographically bound." Peterson, 142 F.3d at 184 (citing Gulf Chem. Corp. v. Raytheon-Catalytic, Inc., 931 F. Supp. 955, 957-58 (D.P.R. 1996)). "Because such corporations can readily transfer and move their investment assets, a jurisdictional test focusing on the location of operations makes little sense." Peterson, 142 F.3d at 184. In such a case, a corporate defendant "does not have any manufacturing plants, purchasing centers, or sales facilities" or similar types of "normal indicia of a corporation's place of operations." Id. Accordingly, the nerve center test places corporate citizenship "where the activities of the

7

corporation are controlled and directed," or "where its executive headquarters are located." Id. at

185 (citing, e.g., Metropolitan Life Ins. Co. v. Estate of Cammon, 929 F.2d 1220, 1223 (7th Cir.

1991)).

By contrast, application of the place of operations test is appropriate where a corporation has

"physical operations by which a corporation's presence in different states can be measured."

Peterson, 142 F.3d at 184. Examples of such physical operations include manufacturing plants,

purchasing centers, sales offices, or other similar types of tangible assets. See id. (citing Industrial

Tectonics, Inc. v. Aero Alloy, 912 F.2d 1090, 1094 (9th Cir. 1990); Topp v. CompAir, Inc., 814

F.2d 830, 834 n.3 (1st Cir. 1987); Grimm v. Plasma Processing Corp., 888 F. Supp. 56, 58 (S.D.W.

Va. 1995)); see also Mullins, 489 F.2d at 262 (citing, e.g., Bruner v. Marjec, Inc., 250 F.Supp. 426

(W.D. Va. 1966)). Accordingly, the place of operations test generally places citizenship "where the

actual physical operations are carried on and directed" rather than "the place where occasional high

level policy decisions are made." Bruner, 250 F. Supp. at 427; Grimm, 888 F. Supp. at 58.

Significant factors in determining the place of operations are "where the corporation has most

of its dealings with its customers and has its greatest contact with the public in general, where it

derives its greatest gross income, and where it is considered to be at home." Bruner, 250 F.Supp.

at 428; see Grimm, 888 F. Supp. at 58 ("[T]he Court must determine where the corporation would

be most visible, would have the most contact with the public, and where the corporation would

consider its home, although no one fact would control."); see also Industrial Tectonics, 912 F.2d at

1094 (noting that "a corporation usually has its greatest contacts with the public where it conducts

most of its business"); J.A. Olson Co. v. Winona, 818 F.2d 401, 411-12 & n.14 (5th Cir. 1987)

(stating that a "significant" factor is "the degree to which the corporation's activities bring it into

8

contact with the community," and noting that "the importance of this factor is addressed by the legislative history of section 1332(c)").

In determining place of operations, the court also must consider "the nature of a corporation's activity: 'whether it is active or passive and whether it is labor-intensive or management-demanding.'" Peterson, 142 F.3d at 411 (quoting J.A. Olson Co., 818 F.2d at 411); see Industrial Tectonics, 912 F.2d at 1094 ("Activities such as employment of personnel, purchasing of materials, and sales of goods and services increase local familiarity with the corporation."). Other factors that should be considered include "the number of locations where the corporation carries on its activities . . . the importance of the particular activity to the corporate purpose and to the corporation as a whole . . . the proportionate share of corporate assets, both of money and time, devoted to the activity and the proportion of its income that the corporation derives from that activity." J.A. Olson Co., 818 F.2d at 411.

Finally, the court may consider "where people are employed, where bank accounts are held, where assets are located, where taxes are paid and returns filed, where administrative, accounting, and corporate records are kept, where meetings are held, etc." Grimm, 888 F. Supp. at 58. Ultimately, which factors are most probative may vary, because "determinations of a corporation's principal place of business must be made on a case by case basis." Athena Auto., Inc. v. Digregorio, 166 F.3d 288, 291 (4th Cir. 1999).

In this case, application of the place of operations test is more appropriate than the nerve center test. Check 'n Go-NC has substantial "physical operations" in the form of Check 'n Go stores where it facilitates the marketing, servicing, and collecting of consumer loans. See Peterson, 142 F.3d at 184. Check 'n Go-NC employs individuals in these stores in North Carolina to assist

9

consumers in obtaining payday loans. (Supp. Aff. of Robert E. Kassner, ¶21). Check 'n Go-NC's

store activities are tangible activities, as opposed to "passive investment" activity or mere ownership

and management of investment of assets. See id. Check 'n Go-NC's business is also

"geographically bound" to North Carolina by virtue of its operation of stores in North Carolina. See

id. Accordingly, the court will apply the place of operations test, rather than the nerve center test,

to determine Check 'n Go-NC's principal place of business.

Applying the place of operations test, although the factors are mixed, the court finds that

most of the probative factors tend to show that Check 'n Go-NC's principal place of business is

North Carolina, as opposed to Ohio. First, Check 'n Go-NC has its "greatest contact with the public"

in North Carolina, due to recurring and widespread contact with North Carolina consumers in its

North Carolina stores. Bruner, 250 F.Supp. at 428. Thus, "the degree to which the corporation's

activities bring it into contact with the community" in North Carolina is significant. J.A. Olson Co.,

818 F.2d at 412.

Check 'n Go-NC also derives income from its activities in North Carolina. As defendants

admit in their own exhibits, Check 'n Go-NC is a "loan servicing company that markets, services,

and collects loans made by County Bank to consumers in the State of North Carolina." (Aff. of

David E. Gillan, ¶7) (emphasis added). Check 'n Go-NC has presented no evidence that it markets,

services or collects loans made to consumers in any state other than North Carolina. Indeed, based

on the evidence presented, Check 'n Go-NC is licensed only by North Carolina, and not any other

state, to act as a collection agency. (Supp. Aff. of Robert E. Kassner, ¶18). As a result of its

participation in marketing, servicing, and collecting consumer loans in North Carolina for County

10

Bank, Check 'n Go-NC obtains in excess of $12.9 million in revenue. (Aff. of Robert E. Kassner, ¶¶7 &8;  Supp. Aff. of Robert E. Kassner, ¶17).

The next factor to be considered is the nature of the employment and management structure of the corporation. Defendants have not presented evidence concerning the numerical division of Check 'n Go-NC employees between Ohio and North Carolina. It is undisputed that all actions by the board of directors of Check 'n Go-NC take place in Ohio, and that all Check 'n Go-NC shareholders, officers and directors are located there as well. It is also undisputed that some number of upper-level Check 'n Go-NC employees in Ohio oversee the operations between Check 'n Go-NC and County Bank.

Defendants indicate, however, that Check 'n Go-NC operates up to 64 stores in North Carolina and employs 207 persons, all of whom would be terminated if Check 'n Go-NC is required to cease operations in North Carolina. (Aff. of Robert E. Kassner, ¶8 (64 stores); see also PLS' Motion to Remand, Dec. of Counsel, Ex. G (Dun & Bradstreet directory listing 43 Check 'n Go-NC stores in North Carolina), Ex. J). With this number of stores in North Carolina, it is reasonable to infer that most of Check 'n Go-NC's employees are physically present in North Carolina assisting customers at Check 'n Go-NC stores. (E.g., Dec. of Walter James Faust, ¶6). See Grimm, 888 F. Supp. at 58 (stating that one factor is "where people are employed"); Industrial Tectonics, 912 F.2d at 1094 ("Activities such as employment of personnel . . . increase local familiarity with the corporation.").

Moreover, although defendants emphasize that most of Check 'n Go-NC's upper-level management functions take place in Ohio, defendants' own evidence indicates that "most administrative services for Check 'n Go are provided by the 409 Group, Inc., which is an Ohio

11

corporation with its principal place of business in Ohio." (Supp. Aff. of Robert E. Kassner, ¶19) (emphasis added). If administrative tasks are undertaken by another corporation in Ohio, this sheds little light on how much of Check 'n Go-NC's own operating activity occurs in that state. In sum, the evidence presented tends to show that most of its employees and labor-intensive operations take place in North Carolina, regardless of whether policy decisions and contracts with banks originate in Ohio.

Other factors bearing on principal place of operations are mixed. For instance, in addition to factors stated above, the court may consider the fact that Check 'n Go-NC's bank accounts are held in Ohio, taxes are presumably filed in Ohio, and records and meetings are held in Ohio. Grimm, 888 F. Supp. at 58. Nevertheless, the court may also consider the fact that Check 'n Go-NC operates a large "number of locations" all within North Carolina, J.A. Olson Co., 818 F.2d at 411, thereby making itself "most visible" within North Carolina. Grimm, 888 F.Supp. at 58. Moreover, Check 'n Go-NC's "sole source of revenue" results from participation interests it purchases on loans made by County Bank to North Carolina consumers. (Supp. Aff. of Robert E. Kassner, ¶17). Therefore, Check 'n Go-NC's marketing, servicing, and collecting activity, involving direct contact with customers in North Carolina, is of paramount "importance . . . to the corporate purpose and to the corporation as a whole." J.A. Olson Co., 818 F.2d at 411. In sum, based upon a preponderance of the factors, Check 'n Go-NC's principal place of operations is in North Carolina.

In their brief, defendants contend that any emphasis placed on the North Carolina store locations is "myopic," and that Check 'n Go-NC has a Deleware and Ohio "focus." (Defs' Mem., p. 8). For example, defendants emphasize that all policies and funding for the loans are set by County Bank in Delaware, and that County Bank, not Check 'n Go-NC enters into contracts with

12

North Carolina consumers. (Defs' Mem., p. 11). The court finds these facts inconsequential. While County Bank, in fact, may play a significant role in providing loans to North Carolina consumers, the responsibilities and activities of County Bank are not directly at issue in this case. What is probative, rather, is the place of Check 'n Go-NC's activity. Here, based on evidence that Check 'n Go-NC is marketing, servicing and collecting loans originating from North Carolina consumers, (see Aff. of David E. Gillan, ¶7; Dec. of Walter James Faust, ¶6), it is reasonable to infer that Check 'n Go-NC maintains a "focus" on North Carolina.

In addition, Check 'n Go-NC emphasizes that "nearly all communications between County Bank and Check n' Go occur between Delaware and Ohio," and that "Ohio is involved with every transaction proposed to and approved by County Bank." (Defs' Mem., pp. 11-12). These facts are also undisputable, but they are, at best, only half of the picture. Check 'n Go-NC is not solely engaged in communicating between Ohio to Delaware. Rather, loan communications that go through Ohio must first originate with stores in North Carolina, and such communications must result from human interaction between consumers in those stores and Check 'n Go-NC employees. (See Supp. Aff. of Robert E. Kassner, ¶10; Aff. of David E. Gillan, ¶9; Aff. of Water James Faust, ¶6; PLS' Mot. to Remand, Dec. of Counsel, Ex. J., pp. 1 & 2 (stating that to "apply for a loan made by County Bank, visit a Check 'n Go location in North Carolina and submit a written application in person").

Moreover, even assuming that some administrative and transmission operations occur in Ohio, Check 'n Go-NC has provided very little evidence concerning what exactly takes place in Ohio with regard to North Carolina loans. (See e.g., Supp. Aff. of Robert E. Kassner, ¶10 (stating only that loan information is "electronically transmitted to Mason, Ohio and then from Mason, Ohio" to

13

County Bank); (Aff. of David E. Gillan, ¶9 (stating that County Bank communicates loan approval electronically, "routing" the decision first through "corporate offices" in Mason, Ohio)). Based on this evidence, it appears that facilities in Ohio are engaged in the transmittal or "routing" of information between County Bank and North Carolina stores. Furthermore, assuming that some kind of "administrative" tasks occur in Ohio, most of these tasks are carried out by a separate company altogether. (Supp. Aff. of Robert E. Kassner, ¶ 19). Accordingly, Check 'n Go-NC has not met its burden of showing by a preponderance of the evidence that its principal place of business is in Ohio or Delaware.

Next, defendants also argue that this case is analogous to several cases cited in their memorandum in opposition to plaintiffs' motion to remand. The court disagrees. For instance, defendants claim that Check 'n Go-NC "resembles the business trust in Peterson, which the Fourth Circuit stated was 'essentially a passive investment vehicle'" with its headquarters as principal place of business. (Defs' Mem., p. 10 (citing Peterson, 142 F.3d at 184-85)). The business trust in Peterson, however, is significantly more limited in operations than Check 'n Go-NC. The business trust in Peterson was formed "solely to acquire and own" two commercial promissory notes issued on a single occasion. Peterson, 142 F.3d at 184 (emphasis added). This lies in stark contrast to a corporation like Check 'n Go-NC which has ongoing financial service operations, employees, stores, and interactions with consumers within a single state. Accordingly, the facts and resulting holding in Peterson are squarely distinguishable from this case.

Next, defendants argue that the facts of this case resemble those in Bel-Bel Intel Corp. v. Community Bank, 162 F.3d 1101 (11th Cir. 1998). The court disagrees. In Bel-Bel, the corporation owned a single investment – a tomato farm in Florida – but the corporation "was not involved in the

14

day-to-day operation of the Florida tomato farm." 162 F.3d at 1106. Rather, the corporation was "designed as a vehicle through which a handful of Venezuelan investors could make loans." Id. The court, accordingly, found that the corporation was not a citizen of Florida but, rather, a citizen of Venezuela. Again, circumstances of Check 'n Go-NC are much different. Unlike the corporation in Bel-Bel, Check 'n Go-NC does not merely own a single investment in the state of North Carolina. Much to the contrary, it is involved in the day to day operations in North Carolina, through the operation of hundreds of employees and dozens of stores in North Carlina. Accordingly, Bel-bel is of little comparative value.

Defendants also cite to Toms v. Country Quality Meats, Inc., 610 F.2d 313, 315 (5th Cir. 1980), for the proposition that the state where a corporation comes into contact with the public is not always the corporation's principal place of business. This is a possibility, but the Fifth Circuit also has stated, more recently, that where a corporation contacts the public is a "significant" factor for determining place of business. J.A. Olson Co., 818 F.2d at 411-12. Moreover, Toms is distinguishable. In Toms, plaintiffs were consumers in Georgia who sought to bring suit in federal court on diversity grounds against a corporation, County Meats, that had sold them allegedly tainted meat. Country Meats was "part of a system of over 60 similar corporations set up in the wholesale and retail meat sale business" all of which were essentially managed by a corporation in Texas. Toms, 610 F.2d at 314. The meat sales companies were located in many "separate" states, and Country Meats was one of these that was located in Georgia. Id. at 315. In Toms, given practical management of widespread retail outlets from a single corporate headquarters, the court pierced the corporate veil of the Georgia retail operation and looked to the place of the managing corporation headquarters. Id. at 316. Such analysis may have been appropriate under the facts of that case. See

headquarters. Id. at 316. Such analysis may have been appropriate under the facts of that case. See Grimm, 888 F. Supp. at 58 (noting that "the nerve center analysis 'is well-suited for cases where there is no clear center of corporate activity because the corporate enterprise is 'far-flung and varied.'") (quoting Aff Enterprises Inc. v. American States Ins. Co., 842 F. Supp. 902, 906 (S.D.W.Va. 1994)). Nevertheless, in this case, by contrast, there is no such evidence justifying recourse to place of parent corporate headquarters.

In summary, considering all the factors bearing on place of operations under the circumstances of this case, defendant Check 'n Go-NC has failed to meet its burden of showing that its principal place of operations is in Ohio (or any other state) rather than North Carolina. To the contrary, the evidence tends to show that Check 'n Go-NC has its principal place of operations in North Carolina. Thus, regardless of whether Check 'n Go-NC is incorporated in Ohio, it is also a citizen of the state of North Carolina for purposes of diversity jurisdiction. Therefore, lacking jurisdiction on the basis of diversity, the court must remand this case to state court.

CONCLUSION

Based on the foregoing, plaintiffs' motion to remand is GRANTED. This case is hereby REMANDED to the Superior Court of New Hanover County, North Carolina. The Clerk is DIRECTED to serve a copy of this order on the Clerk of Superior Court of New Hanover County, North Carolina.

SO ORDERED this 2nd day of Feb, 2005.

LOUISE W. FLANAGAN
Chief United States District Judge

16